RENDERED: APRIL 22, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0022-MR

MARTY "BO" GILLEY AND JACKIE
GILLEY                                                          APPELLANTS


                          APPEAL FROM WHITLEY CIRCUIT COURT
v.                        HONORABLE DANIEL BALLOU, JUDGE
                          ACTION NO. 15-CI-00246


JOE PREWITT, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY
AS DEPUTY SHERIFF OF WHITLEY
COUNTY, KENTUCKY; AND
COLAN HARRELL, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY
AS SHERIFF OF WHITLEY
COUNTY, KENTUCKY                                                 APPELLEES


                                OPINION
                                AFFIRMING

                           ** ** ** ** **

BEFORE: ACREE, JONES, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Marty "Bo" Gilley was injured after he crashed his

tow truck into a tree in a rural area of Whitley County. Gilley alleged the crash

was caused by his vision being impacted from a spotlight shone across the road by Joe Prewitt, a Whitley County Deputy. Gilley and his wife, Jackie Gilley, sued Prewitt and Colan Harrell, then-Sheriff of Whitley County. The Whitley Circuit Court granted summary judgment to Prewitt and Harrell. We affirm.

After dark, one night in May 2014, Prewitt responded to a complaint by a woman who reported that people were making drugs behind her house and driving by and yelling profanities at her. Her house was situated below the roadway, so her driveway sloped down from Highway 92. Prewitt parked near her house and used his cruiser's spotlight to illuminate a nearby field.

Prewitt then heard a vehicle approaching on Highway 92, traveling in the same direction as had the purported vehicles containing the persons who yelled profanities. Prewitt aimed the spotlight at the road, at what he believed to be the height of a typical car, in order to see the vehicle's color, make, and model, but the approaching vehicle turned out to be Bo Gilley's tow truck. At his deposition, Bo Gilley (hereafter Gilley) testified that as he approached the area, he saw a light and thought a car might be preparing to turn onto Highway 92 from the woman's driveway, so he looked over and, in so doing, "looked straight into" the spotlight. According to Gilley, he "lost his vision" and, though he engaged his brakes, his truck went off the road and hit a tree. It is undisputed that at the crash site, Prewitt asked Gilley if he had been impacted by the light, to which Gilley responded in the

-2-

affirmative. Although Gilley testified he was wearing a seat belt, he was transported to the University of Kentucky Hospital for treatment for, among other things, a broken hip.

In April 2015, the Gilleys sued Prewitt and Harrell, in both their individual and official capacities, raising claims of negligence, negligent hiring/supervision, and loss of consortium. The case lingered on the docket for over four years before Prewitt and Harrell jointly moved for summary judgment in September 2019. Among other arguments, Prewitt and Harrell asserted they were entitled to immunity, did not owe Gilley a duty of care based upon the special relationship doctrine, and, if a duty of care were owed, Prewitt's conduct did not breach that duty of care.

In October 2019, the circuit court granted summary judgment to Prewitt and Harrell. The circuit court concluded that Prewitt and Harrell did not owe Gilley any duty of care. Alternatively, the circuit court concluded that if a duty were owed to Gilley, Gilley could not establish a breach of the relevant standard of care owed as Prewitt's use of the spotlight was within the relevant standard of care according to both parties' experts. Therefore, the circuit court determined that the negligence claim failed as a matter of law. After the circuit court denied the Gilleys' motion to alter, amend, or vacate pursuant to Kentucky Rules of Civil Procedure (CR) 59.05, which among other things sought a ruling

that Prewitt and Harrell were not immune from suit and argued that the circuit court erred by making factual findings on the breach of duty issue, the Gilleys filed this appeal.

The Gilleys raise a host of arguments. We conclude as a matter of law that Prewitt and Harrell are each entitled to qualified immunity and there was no breach of Prewitt's duty to Gilley. Therefore, we affirm the circuit court's grant of summary judgment.[1] As the resolution of these issues is dispositive, we decline to make any ruling relating to whether the special relationship doctrine applies to preclude Prewitt from owing Gilley any duty.

Under our familiar standards, summary judgment "shall be rendered forthwith" if the record shows "that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56.03. Our Supreme Court has fleshed out CR 56.03 by holding that:

> The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor . . . . The word "impossible," as set forth in the standard . . . , is meant to be used in a practical sense, not in an absolute sense. Because summary judgment involves only legal questions and the existence of any disputed material

---

[1] Although the circuit court did not rule on the immunity issue, we may affirm the trial court's decision on alternate grounds. *Mark D. Dean, P.S.C. v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 496 (Ky. 2014).

issues of fact, an appellate court need not defer to the
trial court's decision and will review the issue de novo.

*Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 198 (Ky. 2010)

(internal quotation marks and citations omitted).

We begin with the individual capacity claims against Prewitt and
Harrell. Our Supreme Court has held that public officers and employees sued in
their individual capacities enjoy qualified official immunity "when the negligent
act or omissions were (1) discretionary acts or functions, that (2) were made in
good faith (*i.e.* were not made in 'bad faith'), and (3) were within the scope of the
employee's authority." *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006).

Here, the Gilleys have not argued that Prewitt or Harrell acted in bad
faith or outside the scope of their authority. Instead, the qualified immunity
dispute revolves around whether Prewitt's shining the spotlight was a ministerial or
discretionary act, which is key because "[a] government official is not afforded
immunity from tort liability for the negligent performance of a ministerial act."
*Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016).

Determining whether an act is ministerial or discretionary is a
difficult, oft recurring issue which "has long plagued litigants and the courts."
*Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014). Although there can be no
one-size-fits-all definition of what constitutes a discretionary or a ministerial act,
precedent provides guidelines for courts to apply on a case-by-case basis.

A ministerial act is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* at 297 (internal quotation marks and citation omitted). However, somewhat confusingly, "an act is not necessarily outside the ministerial realm just because the officer performing it has some discretion with respect to the means or method to be employed." *Id.* (internal quotation marks and citation omitted). At its core, an act is ministerial if the public official or employee "must" perform it "without regard to his or her own judgment or opinion" concerning its propriety; "[i]n other words, if the employee has no choice but to do the act, it is ministerial." *Id.* (internal quotation marks and citations omitted).

By contrast, a discretionary act, as the name implies, involves "the exercise of discretion and judgment" and so is an act which "necessarily require[s] the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (internal quotation marks and citations omitted).

Stated somewhat differently, our Supreme Court held that qualified immunity shields public officials sued in their individual capacities for "good faith judgment calls made in a legally uncertain environment[,]" or making "bad guesses

-6-

in gray areas[.]" *Sloas*, 201 S.W.3d at 475 (internal quotation marks and citations omitted).

Based on those guidelines, Prewitt's usage of the spotlight was a discretionary act. Using their experience and training, officers must make multiple, ongoing, spur-of-the-moment-type decisions as to what investigative methods and tools are best suited for that particular phase of that particular case. We thus disagree with the Gilleys' argument that Prewitt had a ministerial duty to use a spotlight on the road during his investigation.

Of course, it is uncontested that police officers are, generally speaking, trained on proper usage of a spotlight. But the Gilleys cite *nothing* specific in the record or law (statute, administrative regulation, binding law enforcement officer policy) which imposed upon Prewitt an absolute, certain, and imperative duty to use a spotlight as part of his investigation. For example, although we need not delve too deeply into the realm of hypotheticals, it is beyond rational dispute that Prewitt would have acted reasonably if, instead of using his spotlight, he elected first to wait silently in the dark on the woman's property to see if any drug trade associates approached.

There simply is no universal, fixed way in which a law enforcement officer must investigate allegations of criminal activity.[2] The act of investigating the woman's complaints "may [have] be[en] performed in one or two or more ways, either of which would be lawful" and thus was "left to the will or judgment of the performer to determine in which way it shall be performed." *Haney*, 311 S.W.3d at 240 (citation omitted). Thus, Prewitt used his discretion to elect to use the spotlight (or not use it) as part of his investigatory methodology. Just as they have not shown that Prewitt's decision to use the spotlight was improper, the Gilleys cannot show that Prewitt's actual method of using the spotlight was improper since their own expert, Joey Stidham, testified that Prewitt used the spotlight appropriately.

In sum, Prewitt had a ministerial duty to conduct an investigation into the alleged criminal conduct but had discretion in choosing how to perform that mandatory duty. Accordingly, his usage of the spotlight was discretionary and so, under these facts, he is entitled to qualified official immunity. That conclusion also dooms the individual capacity claims against Harrell, which are dependent upon Prewitt's negligence. *See* 70 AM. JUR. 2d *Sheriffs, Police, and Constables* §

---

[2] The parties have not cited, nor have we independently located, published authority directly on point. However, in an unpublished case our Supreme Court concluded that police officers are acting in a discretionary manner when they investigate criminal offenses. *Jones v. Bennett*, No. 2014-SC-000425-DG, 2016 WL 4487189, at *3-4 (Ky. Aug. 25, 2016) (unpublished). We agree with its reasoning and conclusion.

58 (2021) (explaining "[s]upervisory liability imposed on a sheriff requires proof of the underlying liability of a deputy.").

Since qualified immunity pertains only to individual capacity claims, we now turn to the Gilleys' official capacity claims. Our Supreme Court has held that "absent a waiver thereof, a sheriff, as a county official, has absolute official immunity at common law for torts (by him or his deputies) when sued in his official capacity." *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008). But, the Court reasoned, by enacting Kentucky Revised Statutes (KRS) 70.040,[3] the General Assembly waived the office of the sheriff's immunity "for the tortious acts or omissions of his deputies." *Jones*, 260 S.W.3d at 346. However, KRS 70.040 refers only to the sheriff's being liable for the acts or omissions of deputies; the statute does not contain an express waiver of the sheriff's immunity for his own acts or omissions.

We may "find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Withers v. University of Kentucky*, 939 S.W.2d

---

[3] KRS 70.040 provides:

> The sheriff shall be liable for the acts or omissions of his deputies; except that, the office of sheriff, and not the individual holder thereof, shall be liable under this section. When a deputy sheriff omits to act or acts in such a way as to render his principal responsible, and the latter discharges such responsibility, the deputy shall be liable to the principal for all damages and costs which are caused by the deputy's act or omission.

340, 346 (Ky. 1997) (internal quotation marks and citation omitted). Therefore, since KRS 70.040 does not waive the sheriff's inherent immunity for claims based on his or her own acts or omissions, Harrell is immune from the official capacity claims against him, such as failure to train and supervise.[4]

We therefore turn to whether Prewitt is immune from the official capacity claims against him. As is clearly provided in KRS 70.040, a deputy is liable to the sheriff "for all damages and costs which are caused by the deputy's act or omission."[5] Therefore, the official capacity claims against Prewitt are not barred by immunity which means that, under the plain language of KRS 70.040,

---

[4] The parties have not cited, nor have we independently located, any binding published authority directly on point. However, in *Harlan County v. Browning*, No. 2012-CA-000148-MR, 2013 WL 657880, at *2-3 (Ky.App. Feb. 22, 2013) (unpublished), which involved whether a sheriff could be liable for negligent hiring, training, and supervision of his deputy who pled guilty to facilitation to commit murder, the Court concluded that the sheriff is a county official whose official capacity is cloaked in sovereign immunity and shields him from "his own intentional or unintentional wrongful acts[,]" with his immunity only being waived by KRS 70.040 for the acts or omissions of his deputies. We agree with this reasoning and note that *Browning* has been cited by *Fox v. Brumback*, No. 2018-CA-001782-MR, 2019 WL 6817315, at *2 (Ky.App. Dec. 13, 2019) (unpublished), and *Martin v. Patterson*, No. 5:12-cv-117-KKC, 2013 WL 5574485, at *4 (E.D. Ky. Oct. 9, 2013) (unpublished). Similarly, the United States District Court for the Western District of Kentucky reached a conclusion consistent with *Browning* in an unpublished opinion predating *Browning*. *Meogrossi v. Aubrey*, No. 3:09-cv-00301-JDM, 2011 WL 1235063, at *19 (W.D. Ky. Mar. 31, 2011) (unpublished).

[5] The interpretation of the statute is supported by *Browning*, 2013 WL 657880, at *3, which held that a deputy at common law "would be entitled to the same immunity possessed" by a sheriff for official capacity claims, as KRS 70.040 "clearly contemplates that deputies shall be liable for damages to the sheriff incurred by the sheriff upon waiver of immunity for his deputies' acts and omissions." The Court determined that, "[a]ccordingly, the only logical interpretation of the statute is to legally construe it to waive immunity for deputies also while acting in their official capacity." *Id.*

-10-

Harrell in his official capacity as sheriff may be held liable for his deputy's acts or omissions.

However, for Harrell in his official capacity to be held liable for Prewitt's acts, there must be evidence which could support all of the elements of negligence. Common law negligence "requires proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (citations omitted).

We agree with the circuit court that even when all questions of facts are resolved in favor of the Gilleys, there is no basis to support a breach of such a duty by Gilley under the particular factual circumstances of this case. There was no evidence or even intimation that Prewitt did not follow proper police protocol in using the spotlight. The experts and Harrell consistently testified that Prewitt used the spotlight consistent with his police training, with the Gilleys' own expert, Stidham, testifying that Prewitt used the spotlight appropriately, explaining "[a]nd just so we are clear, as far as the officer using the light the way he was using it, I have no issue with."

The Gilleys make interrelated arguments as to how it could be established that Prewitt was negligent, despite the lack of any evidence that he used the spotlight inappropriately. The Gilleys suggest that perhaps the angle of

-11-

the spotlight being positioned from lower location at which the officer was standing, or the fact that Gilley sat higher in his tow truck than would a typical motorist in a car, may have made Prewitt's particular use of the spotlight negligent. However, after four years of discovery, they have absolutely no evidence to support this argument.

Mixed up with this argument is the Gilleys' conclusion that because the spotlight was the cause (or a contributing cause)[6] of Gilley crashing his tow truck, Prewitt must have been negligent. However, there is a difference between something being the "cause" under a lay person's terms and "legal causation" which requires a causal relationship between the breach of a duty and the injury.

Additionally, legal causation is but one of four factors that must be established to prove negligence. *Compare with Island Creek Coal Co. v. Rodgers*,

---

[6] There are certainly questions about whether Gilley's action of turning to look toward the spotlight and his subsequent driving behavior afterwards could be the legal cause of the accident. In cases regarding being blinded by headlights, Kentucky Courts have observed that such a motorist "has a duty to take such protective measures for his own safety as an ordinarily prudent driver would take under the same or similar circumstances." *Morrison v. Hibbard*, 375 S.W.2d 685, 688 (Ky. 1964). Such a motorist "is not entitled to proceed as if he could see ahead, but is required to take additional precautions for the safety of himself and others which are commensurate with the existing danger[.]" *Service Lines, Inc. v. Mitchell*, 419 S.W.2d 525, 528-29 (Ky. 1967). *See also Bell v. Cooksey*, 419 S.W.2d 548, 549-50 (Ky. 1967) (determining that a motorist who claimed to have been blinded by sunlight for almost a quarter of a mile before he hit a pedestrian on the side of the road, but did not slow down or use his sun visor during that time, was negligent as a matter of law). However, for purposes of our review, we will assume the facts most favorable to Gilley, that he acted appropriately in looking toward the spotlight and reacted appropriately in how he drove after being blinded by it.

-12-

644 S.W.2d 339, 348 (Ky.App. 1982) (explaining that in blasting cases, where strict liability applies, only causation need be proven).

Gilley's testimony relates entirely to a lay person's understanding of causation rather than to a connection between what occurred and a breach of duty by Prewitt. Similarly, Stidham's further testimony discusses actual rather than legal causation. Stidham testified that based on how close Gilley was to the spotlight "either the headlights on low beam or the spotlight would be more than sufficient to cause the issues he was complaining about." Stidham further explained, "I think that both of the error [sic] on the part of Deputy Prewitt and Mr. Gilley's dark adaptation and/or the glare that he suffered were causative factors."

Alternatively, the Gilleys argue that because Gilley crashed his tow truck after Prewitt used the spotlight, and when Prewitt came to Gilley's aid he asked if the spotlight had caused the crash and Gilley answered affirmatively, ergo, Prewitt should have known that his use of the spotlight caused Gilley's accident. Therefore, the Gilleys argue that Prewitt must have violated the duty of care he had toward Gilley, or else the accident would not have occurred. In making this argument, the Gilleys must rely on *res ipsa loquitur* to infer that because Gilley crashed, Prewitt's use of the spotlight must have been negligent.

"There may be an inference of negligence [through *res ipsa loquitur*] when, according to common knowledge and experience, *the accident would not*

-13-

*have happened except for* the wrongful act of the defendant." *Jos. N. Rice Co. v. Grayson*, 341 S.W.2d 238, 239 (Ky. 1960).

The elements of *res ipsa loquitur* are as follows:

(1) The defendant must have had full management and control of the instrumentality which caused the injury.

(2) The circumstances must be such that, according to common knowledge and the experience of mankind, the accident could not have happened if those having control and management had not been negligent.

(3) The plaintiff's injury must have resulted from the accident.

*Cox v. Wilson*, 267 S.W.2d 83, 84 (Ky. 1954).

The first element is problematic for Gilley because it is still unclear whether the instrumentality which caused the injury was the spotlight, the tow truck, or both. However, even if it could be concluded that the spotlight was to blame, the second factor is problematic for Gilley, too.

"Res ipsa loquitur applies only where the thing shown speaks of negligence of the defendant and not merely the occurrence of an accident." *Helton v. Forest Park Baptist Church*, 589 S.W.2d 217, 219 (Ky.App. 1979).

The fact that some mystery accompanies an accident does not justify the application of the doctrine of res ipsa loquitur. The fact that we cannot pinpoint an act of omission or commission wherein one fails to respect the rights of others does not summon its use. A lack of knowledge as to the cause of the accident does not call for the application of the doctrine. The separate

-14-

circumstances of each case must be considered and from them it must be first decided whether according to common knowledge and experience of mankind, this accident could not have happened if there had not been negligence.

> *The primary responsibility for this decision rests upon the court because it is the court's duty judicially to notice whether as a matter of common experience the accident could not have happened without dereliction in duty on the part of the person charged with the management and operation of the thing.* In other words, the doctrine of res ipsa loquitur does not involve the establishment of the ultimate fact by circumstantial evidence or of presumed negligence merely because of injury.

*Cox*, 267 S.W.2d at 84 (emphasis added) (citation omitted).

Sometimes bad things happen without any negligence being involved at all, but rather a confluence of events results in a poor outcome without anyone being to blame or it being so unclear who might be to blame that no one can be found to be negligent. In such cases, a directed verdict or the granting of summary judgment is appropriate. For example, in *Rowe v. Oscar Ewing Distributing Company*, 357 S.W.2d 882, 885 (Ky. 1962), the Court affirmed a directed verdict for a milk company where a milk bottle broke in a person's hand thereby causing a serious injury, on the basis that *res ipsa loquitur* could not properly be applied when it was a matter of speculation and conjecture as to why the bottle broke. In *Cox*, 267 S.W.2d at 85, the Court affirmed a directed verdict for the defendants and rejected the application of *res ipsa loquitur* as there was no indication that any

-15-

negligence by the defendants caused the bus tire to rupture and it was this event that was ultimately responsible for the accident that followed.[7]

The issue of negligence can be resolved by a court if the circumstances and the fair inferences to be drawn from them "so clearly . . . overcome the inference of negligence that reasonable minds could not differ about the ultimate conclusion." *Jones v. Carr*, 382 S.W.2d 853, 858 (Ky. 1964). We agree with the circuit court that "there is no material issue of fact as to negligence which could be considered by a jury or sustain its verdict" because the circumstances surrounding this accident are not sufficient to support an inference of negligence through *res ipsa loquitur* as the occurrence of the accident in and of itself is insufficient to establish that Prewitt was negligent. Without such an

---

[7] Although the published examples relate to directed verdicts, recent unpublished cases from our Court have also affirmed the granting of summary judgment dismissing claims of negligence based on the trial court's legal ruling that *res ipsa loquitur* did not apply. *See Gilbert v. U-Haul International Inc.*, No. 2013-CA-000772-MR, 2015 WL 136140, at *2 (Ky.App. Jan. 9, 2015) (unpublished) (affirming grant of summary judgment rejecting that *res ipsa loquitur* could establish negligence for the accident because the single vehicle accident could have occurred even if the driver was not negligent, as "the accident could have been due to some malfunction of the trailer, negligence of the manufacturer, or some other reason outside the reasonable control of [the driver]") and *Barrister Farm, LLC v. Upson Downs Farm, Inc.*, No. 2004-CA-002651-MR, 2006 WL 319344, at *5-7 (Ky.App. Feb. 10, 2006) (unpublished) (affirming grant of summary judgment rejecting that *res ipsa loquitur* could establish a presumption of negligence in the cause of a barn fire believed to have originated from stored hay where there was no evidence the barn's owner/operator had done anything wrong in how the hay was stored or had otherwise not taken reasonable precautions).

inference, negligence cannot be established in this case and summary judgment was appropriately granted to Prewitt and Harrell.

We do not discount that under different facts the use of a spotlight by a law enforcement officer could be negligent. However, Prewitt acted properly and in accordance with his training in how he deployed the spotlight.

Gilley testified he was impacted by the spotlight *after* he turned his head toward it to see if there was a vehicle coming down the driveway toward the highway. As Stidham testified, Gilley's vision could have been similarly impacted by headlights on low beam. We think it unlikely that anyone would ever even argue that a motorist using low beam headlights for illumination at night had a duty not to use them while driving uphill toward the junction with another road in the unlikely event that another motorist's vision would thereby be negatively impacted by the light. Similarly, we do not believe that the police must refrain from appropriately using spotlights at night on the off chance that an accident may occur as a result.

What occurred to Gilley appears to be an unfortunate accident, but sometimes accidents happen without anyone being negligent. In such situations, the loss remains on the victim.

For the foregoing reasons, the Whitley Circuit Court's grant of summary judgment is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANTS:          BRIEF FOR APPELLEES:

R. Scott Wilder                 Jason E. Williams
Melissa R. Dixon                John F. Kelley, Jr.
London, Kentucky                London, Kentucky